### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF MISSISSIPPI
### JACKSON DIVISION

**JOHNNIE R. KEYS**                                                               **PLAINTIFF**

**v.**                                                 **CIVIL ACTION NO. 3:11-cv-617-CWR-FKB**

**CHICAGO TITLE INSURANCE COMPANY**                                    **DEFENDANT**

### MEMORANDUM OPINION AND ORDER
### DENYING MOTION FOR SUMMARY JUDGMENT

Before the Court are Defendant Chicago Title Insurance Company's ("Chicago Title")

Motion for Summary Judgment [Docket No. 26],[1] Chicago Title's supporting brief, Plaintiff

Johnnie R. Keys' response to Chicago Title's motion, and Chicago Title's reply. The Court,

after reviewing the motion, briefs of the parties, and relevant law, finds that the motion must be

DENIED.

### I. BACKGROUND

This case arises out of an insurance coverage dispute. Plaintiff Johnnie R. Keys

purchased a title insurance policy ("Title Policy") from Chicago Title in October 2007, in

connection with her purchase of a home from her son. Def.'s Mot. Summ. J. Ex. B. The

effective date of the policy was October 16, 2007, and the amount of insurance was $60,000. *Id.*

at 2. The Title Policy states, under the "Covered Risks" section, that Chicago Title "insures, as

of Date of Policy . . . against loss or damage . . . sustained or incurred by the Insured by reason

of" certain listed title defects such as liens or encumbrances on the title. *Id.* at 1. Furthermore,

Section 8 of the Conditions of the Title Policy provides that the policy "is a contract of

indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant

---

[1] Chicago Title has also filed a second motion for summary judgment. The Court will rule separately on that motion.

who has suffered loss or damage by reason of matters insured against by the policy." *Id.* at 5.

Finally, the Title Policy's Continuation of Insurance provision states that "[t]he coverage of this policy shall continue in force as of Date of Policy in favor of an Insured, but only so long as the Insured retains an estate or interest in the Land . . . ." *Id.* at 4.

On or about October 27, 2008, Keys mailed a notice of claim under the Title Policy to Chicago Title after discovering, while attempting to sell the home, that a federal tax lien was levied against the property. Pl.'s Resp. to Chicago Title's Mot. Summ. J. Ex. 1 ¶ 4 (hereinafter referred to as "Keys Aff."). The content of the letter is as follows:

> Enclosed are copies of my Owner's Policy of Title Insurance, Schedule A&B and Warranty Deed dated October 11, 2007.
>
> I am in the process of selling the Property [at a Jackson, Mississippi, address] only to find out from the Closing Attorney, that there is a Tax Lien dated before I bought the property.
>
> I can be reached at the above address or [at two phone numbers]
>
> Sincerely
>
>
> Johnnie Ruth Keys

Keys Aff. Ex. D. Keys alleges that because of the "presence of the lien and Chicago Title's failure to satisfy the lien, the closing did not go forward." Keys Aff. ¶ 4.

More than nine months after sending Chicago Title a notice of claim, on August 5, 2009, Keys conveyed the property by quitclaim deed to Johnnie Ruth Keys, as trustee of The Johnnie Ruth Keys Revocable Trust ("the Keys Trust"). Keys Aff. ¶ 5; Keys Aff. Ex. E. Keys created the Keys Trust in 2006 "to provide for the convenient administration of the assets of JOHNNIE

RUTH KEYS without the necessity of court supervision in the event of the Trustor's incapacity or death." Keys Aff. ¶ 8; Keys Aff. Ex. F.

After Chicago Title denied Keys' claim, Keys filed a lawsuit against Chicago Title in the Circuit Court of Hinds County, Mississippi, on August 8, 2011, with claims for (1) specific performance, (2) breach of contract, (3) breach of duty to investigate/gross negligence, (4) breach of good faith and fair dealing, (5) tortuous breach of contract, (6) fraud and fraud inducement, and (7) bad faith and outrageous conduct. Chicago Title removed the case on the basis of diversity jurisdiction on September 30, 2011. After conducting discovery, it now seeks summary judgment for the following reasons: (1) Keys lacks standing to sue Chicago Title as an individual because, after transferring the property at issue to the Keys Trust in August 2009, she is not the real party in interest; and (2) the Keys Trust, the present owner of the property, never made a claim under the Title Policy.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by "citing to particular parts of materials in the record . . . ." Fed. R. Civ. P. 56(c)(1)(A). A dispute is genuine "if the evidence supporting its resolution in favor of the party opposing summary judgment, together with any inferences in such party's favor that the evidence allows, would be sufficient to support a verdict in favor of that party," *St. Amant v. Benoit*, 806 F.2d 1294, 1297 (5th Cir. 1987), and a fact is material if it is one that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

3

248 (1986).

### III. ANALYSIS

This Court has jurisdiction over this insurance coverage dispute based on diversity

jurisdiction, and therefore, Mississippi law controls the interpretation of the Title Policy.[2]  *See*

*Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009).  State law is determined

by looking to the decisions of the state's highest court.  *St. Paul Fire & Marine Ins. Co. v.*

*Convalescent Servs., Inc.*, 193 F.3d 340, 342 (5th Cir. 1999).

Under Mississippi law, insurance policies are matters of contract, so the Court interprets

insurance contracts according to the same rules that govern other contracts.  *Prudential Ins. Co.*

*of America v. Stewart*, 969 So. 2d 17, 21 (Miss. 2007).  An insurance policy should be analyzed

by focusing on "an objective reading of the words employed in the contract."  *Wiley*, 585 F.3d at

211 (quoting *Facilities Inc. v. Rogers-Usry Chevrolet, Inc.*, 908 So. 2d 107, 111 (Miss. 2005)).

If the language of an insurance policy is ambiguous, "a reasonable construction in favor of the

insured is indicated."  *Willow Ridge Ltd. P'ship v. Stewart Title Guar. Co.*, 706 F. Supp. 477,

482 (S.D. Miss. 1988) (quoting *Great Am. Ins. Co. v. Bass*, 44 So. 2d 532, 533 (Miss. 1950)).  In

the present case, the language of the Title Policy refutes Chicago Title's arguments that neither

Keys as an individual nor Keys as trustee of the Keys Trust may sustain an action against

Chicago Title.

### A. Keys has standing to sue Chicago Title.

The doctrine of standing arises out of Article III, Section 2 of the United States

Constitution, which provides that the federal judicial power shall only extend to actual "cases or

---

[2] Through the Title Policy, the parties also have agreed that Mississippi law applies because the subject property is located in Mississippi.  *See* Def.'s Mot. Summ. J. Ex. B, at 6 ("[T]he court or an arbitrator shall apply the law of the jurisdiction where the Land is located . . . to interpret and enforce the terms of this policy.").

controversies." *Comer v. Murphy Oil USA, Inc.*, 839 F. Supp. 2d 849, 857 (S.D. Miss. 2012) (quoting U.S. Const. art. III, § 2, cl. 1). Federal courts require that plaintiffs satisfy three elements to establish standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). First, the plaintiff must have suffered an "injury in fact," which is an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical. *Id.* Second, there must be a causal connection between the injury and the conduct complained of. *Id.* Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Id.* Standing is determined as of the commencement of a lawsuit. *Id.* at 571 n.5.

Here, Chicago Title's standing argument hinges on element one, whether Keys experienced an invasion of a legally protected interest. Chicago Title argues that Keys, an individual–as opposed to Keys, trustee of the Keys Trust–is not the real party in interest because she deeded the property that was the subject of the Title Policy to the Keys Trust prior to filing her Complaint on August 8, 2011.[3] Chicago Title's argument is without merit.

The Title Policy states, under the relevant portions of the "Covered Risks" section, that Chicago Title insures "against loss or damage . . . sustained or incurred by the Insured by reason of" an enumerated list of title defects. Def.'s Mot. Summ. J. Ex. B, at 1. Additionally, Section 8 of the Conditions of the Title Policy states, "This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by the policy." *Id.* at 5. According to the Title

---

[3] In Chicago Title's Reply, it concedes that the Keys Trust, for which Keys is the trustee, has standing to sue Chicago Title. Def.'s Reply to Pl.'s Resp. to Its Mot. Summ. J. ¶ 3 ("Initially, it should be noted that Chicago Title is not challenging the coverage afforded the Trust under the Policy. Instead, Chicago Title asserts that based upon the applicable policy language and Mississippi law, Plaintiff no longer can make a ***personal*** claim concerning the purported title defect because the Trust, and not Plaintiff, is now owner of the Subject Property.").

Policy's Continuation of Insurance provision, the "coverage of [the] policy shall continue in force as of Date of Policy in favor of an Insured, but only so long as the Insured retains an estate or interest in the Land . . . ."[4]  *Id.* at 4.

The precise issue before the Court, therefore, is whether the Continuation of Insurance provision precludes Keys, as an individual, from sustaining this lawsuit for a loss incurred and a claim made under the Title Policy before she conveyed the property to herself as trustee of the Keys Trust, when Keys filed her lawsuit after the conveyance.

Chicago Title relies on cases involving an insured's conveyance of property or loss of property through foreclosure, and the resulting termination of a title insurance policy in accordance with the policy's continuation of coverage provision.  *See, e.g.*, *Willow Ridge*, 706 F. Supp. at 480-81; *Kwok v. Transnation Title Ins. Co.*, 89 Cal. Rptr. 3d 141, 147-48 (Cal. Ct. App. 2009); *Soldiers', Sailors', Marines' and Airmen's Club, Inc. v. Carlton Regency Corp.*, 911 N.Y.S.2d 774, 782-83 (N.Y. Sup. Ct. 2010); *Shotmeyer v. New Jersey Realty Title Ins. Co.*, 948 A.2d 600, 605-06 (N.J. 2008); *Butera v. Attorneys' Title Guar. Fund, Inc.*, 747 N.E.2d 949, 954 (Ill. App. Ct. 2001).  But that reliance is misplaced.  According to the Title Policy's Continuation of Insurance provision, Keys' transfer of the subject property to herself as trustee of the Keys Trust via quitclaim deed terminated the Title Policy as to Keys individually, but none of the cases on which Chicago Title relies support its assertion that Keys, as an individual, lacks standing to bring an action against Chicago Title based on a claim of loss dated before she

---

[4] The Continuation of Insurance provision also states that coverage continues "so long as the Insured shall have liability by reason of warranties in any transfer or conveyance of the Title," Def.'s Mot. Summ. J. Ex. B, at 4, but because Keys conveyed the subject property to herself as trustee of the Keys Trust via quitclaim deed instead of warranty deed, Def.'s Mot. Summ. J. Ex. A, this portion of the Continuation of Insurance provision is inapplicable.

conveyed the property.[5]

In *Willow Ridge Ltd. Partnership v. Stewart Title Guaranty Co.*, the insured, Willow Ridge, sued its title insurance company, Stewart Title, alleging breach of a title insurance policy. *Willow Ridge*, 706 F. Supp. at 478. Willow Ridge bought title insurance in conjunction with its purchase of an apartment complex. *Id.* at 478-79. The insurance policy included coverage for unrecorded materialmen's liens. *Id.* at 479. Under the terms of the insurance policy, a claim did not arise and was not maintainable "until there has been a final determination by a court of competent jurisdiction . . . adverse to the title, as insured." *Id.* at 482. Furthermore, the insurance policy provided that "the coverage of this policy shall continue in force as of Date of Policy in favor of an insured so long as such insured retains an estate or interest in the land . . . ." *Id.* at 486.

After Willow Ridge purchased the property, materialmen began filing liens on the property. *Id.* at 479. Both Willow Ridge and Stewart Title believed that the liens were not valid against the property, but there was never a judicial determination of the validity of the liens. *Id.* at 481, 486. Stewart Title did not take action to cure the liens on Willow Ridge's property, and Willow Ridge eventually lost the property in foreclosure. *Id.* at 480. In its complaint against Stewart Title, Willow Ridge alleged that the title to the apartment complex was defective and unmarketable because of unrecorded materialmen's liens, and that "Stewart Title, after being timely notified of the liens, failed and refused to clear the title of the defect caused by the liens;

---

[5] Notably, one of the cases on which Chicago Title relies undermines Chicago Title's argument. *See Shotmeyer v. New Jersey Realty Title Ins. Co.*, 948 A.2d 600, 607 (N.J. 2008). In *Shotmeyer*, the Supreme Court of New Jersey stated, "Even if [the insureds] were insured as individuals in 1981, though, they would not be entitled to recover under the facts of this case because they did not have an insurable interest at the time of the loss. . . . At the time of the loss here, in or about 2000, the property had been conveyed to a new entity . . . ." *Id.* This language identifies that the time of loss, not the date of lawsuit, determines whether an insured may recover for a claim under a title insurance policy.

that the defect in the title contributed to the foreclosure of the property by the Bank of Meridian; and that because of Stewart Title's refusal to clear the title and later to defend against the foreclosure, Willow Ridge suffered loss and damage." *Id.* at 481.

Based on the terms of the title insurance policy,  Stewart Title maintained that it was never obligated to pay the amounts claimed by the lienors without a determination of the liens' validity since both Stewart Title and Willow Ridge questioned the validity of the liens.  *Id.* at 481.  Furthermore, Stewart Title argued that once Willow Ridge lost title to the property, Stewart Title was not obligated to Willow Ridge for anything occurring after the foreclosure.  *Id.* at 485. After reviewing the evidence, the court agreed that

> once the insured's interest in the land ceases, the coverage under the policy terminates.  Hence, once Willow Ridge lost title to the property through foreclosure, it no longer had any legal interest in the property and the policy was rendered ineffective.  And, since there was never a determination as to the validity of liens prior to the foreclosure, Stewart Title's duty to pay based on the alleged defect never arose.

*Id.* at 486.

Contrary to Chicago Title's interpretation of *Willow Ridge*, the case does not support the proposition that after an insured has conveyed or lost property to another entity, the insured no longer has standing to bring an action against a title insurance company for a loss and claim that occurred *while the insured still owned the subject property*.  *Willow Ridge* simply provides that because there was no legal determination of the validity of the liens, Stewart Title had no duty to pay during Willow Ridge's ownership of the property, and therefore, Willow Ridge had no viable claims against Chicago Title under the policy after foreclosure.  *See id.* at 485-86.  The court's language in *Willow Ridge*, however, suggests that had there been a determination of the

8

validity of the liens before foreclosure, Stewart Title's duty to pay would have arisen, thereby creating a cause of action for Willow Ridge. *See id.* at 486 ("And, since there was never a determination as to the validity of liens *prior to* the foreclosure, Stewart Title's duty to pay based on the alleged defect never arose.") (emphasis added). Nothing in *Willow Ridge* suggests that an insured must make a claim under an insurance policy and adjudicate an insurer's liability for failure to satisfy the claim before conveying the property to another entity. *See id.*

This interpretation has also been adopted by courts in other jurisdictions. *See, e.g.*, *Chicago Title Ins. Co. v. 100 Inv. Ltd. P'ship*, 355 F.3d 759, 761-66 (4th Cir. 2004); *M & I Marshall & Isley Bank v. Wright*, No. CV-10-01657-PHX-FJM, 2011 WL 181292, at *3 (D. Ariz. Jan. 19, 2011) (interpreting a continuation of coverage provision almost identical to Chicago Title's provision and determining that when plaintiff submitted a claim under its title insurance policy in October 2009, and the coverage period of the policy ended in November 2009, "[o]bviously, the end of the coverage period would not affect claims submitted during the coverage period"). For example, in *Chicago Title Insurance Co. v. 100 Investment Ltd. Partnership*, the Fourth Circuit Court of Appeals, while interpreting a Chicago Title policy under Maryland law, concluded that not only may an insured sue a title insurance company after termination of a title insurance policy for claims made while the policy was still in effect, but the insured may make a claim under the title policy after the title policy's termination if the loss or damage arose from actions that took place during the policy period. 355 F.3d at 765-66. In *100 Investment*, Chicago Title filed suit against an insured, 100 Investment Limited Partnership ("100 Investment"), to determine whether Chicago Title must indemnify 100 Investment for (1) expenses incurred by the insured to resolve a defect in title to land when the expenses were

incurred after the insured conveyed the land away; and (2) the cost of defending an action for

trespass filed after the policy period, based on damage sustained during the policy period.  355

F.3d at 761.  The dispute arose from the following facts.  Chicago Title's predecessor issued a

title insurance policy to 100 Investment for land that 100 Investment purchased in October 1986

from Frances Miller and Mildred Miller ("the Miller Tract").  *Id.* at 761.  The policy insured 100

Investment "against loss or damage . . . sustained or incurred by the insured by reason of [t]itle

to the estate or interest described in Schedule A [a fee simple interest in the 300-acre

assemblage] being invested otherwise then as stated therein."  *Id.* at 763.

 In 1995, 100 Investment conveyed the Miller Tract to NVR Homes, without warranty to

cover any defect in title created before 100 Investment owned the land.  *Id.* at 761.  In July 2001,

100 Investment discovered that Frances Miller and Mildred Miller had already sold the Miller

Tract to another person, Dr. Ahsan Khan, four years before 100 Investment bought the land.  *Id.*

at 761-62.  Dr. Khan subsequently conveyed the property to Meadowridge Properties, Inc.,

which later conveyed the property to Courtyards at Timbers, LLC.  *Id.* at 762.  When 100

Investment learned of this competing conveyance, it repurchased the Miller Tract from

Courtyards at Timbers for $175,000  to "clean up" title to the tract that it had conveyed to NVR

Homes.  *Id.*   Also, in March 2002, Dr. Khan filed an action against 100 Investment for

trespassing on the Miller Tract from 1986 to 1995, when 100 Investment purportedly owned the

tract.  *Id.*

 100 Investment sought reimbursement from Chicago Title for the $175,000 repurchase of

the Miller Tract.  *Id.*  100 Investment also asked Chicago Title to provide 100 Investment a

defense against Dr. Khan's litigation.  *Id.*  Chicago Title denied both claims, stating that when

100 Investment conveyed the Miller Tract to NVR Homes in July 1995, its coverage with respect to the property ended. *Id.*

In reviewing the district court's determination that Chicago Title was obligated to satisfy both of 100 Investment's claims, the Fourth Circuit considered the continuation of coverage provision of the title policy. *Id.* at 763-66. Under that provision, the coverage would extend only "as long as [the] insured retains an estate or interest in the land . . . or so long as such insured shall have liability by reason of covenants of warranty made by such insured in any transfer or conveyance of such estate or interest." *Id.* at 763. The court held that because 100 Investment did not give NVR Homes a warranty against defects of the title that existed before 100 Investment owned the Miller Tract, 100 Investment's conveyance of the Miller Tract to NVR Homes in 1995 ended 100 Investment's "estate or interest" in the land, and therefore terminated any insurance coverage for defects in title. *Id.* at 765. Thus, Chicago Title was not responsible for the $175,000 that 100 Investment spent when it repurchased the Miller tract six years after the title policy terminated. *Id.*

On the other hand, the court specifically rejected Chicago Title's assertion that it was not responsible for defending 100 Investment against Dr. Khan's litigation, which commenced after the policy period. *Id.*

> Insofar as the basis of the Khan litigation was a dispute over title to the 1.145-acre Miller tract while 100 Investment was still the purported owner of the tract, the policy covers the loss or damage. The policy provides that it insures against any "loss or damage . . . and costs, attorneys' fees and expenses which [100 Investment] may become obligated to pay" during the policy period because of a title defect.

*Id.* The court pointedly rejected Chicago Title's argument that because 100 Investment did not make a claim before it conveyed the property to NVR Homes in 1995, 100 Investment was no

11

longer insured for the tract.  *Id.* at 765-66.  Finding Chicago Title's argument "inconsistent with the language of the policy," the court expounded on its interpretation of the policy's language:

> There is no language in the policy identifying it as a "claims-made" policy, covering an insured only for claims that are asserted during the policy period.  To the contrary, the language of the policy does not refer to claims, but rather to loss or damage.
> . . .
> In this case, the policy period for the 1.145 acre Miller tract was from December 18, 1986 until July 7, 1995, and the loss or damage alleged in the Khan litigation occurred during that period.

*Id.* at 766.  Therefore, Chicago Title was obligated to provide 100 Investment a defense in the Khan litigation, even though 100 Investment's title policy had already terminated.[6]  *Id.*

Based on the foregoing, an insured may bring an action against a title insurance company based on a claim made during the term of the title insurance policy, even if at the commencement of the lawsuit, the title insurance policy has already terminated as to the insured.  Accordingly, Keys, individually, has standing to sustain her action against Chicago Title because she has presented evidence of loss incurred and a claim made under the Title Policy while the policy was still effective as to Keys individually.  Chicago Title issued the Title Policy to Keys on October 16, 2007.  *See* Def.'s Mot. Summ. J. Ex. B.  The Title Policy remained effective as to Keys, individually, until August 5, 2009, when she conveyed the property to Johnnie Keys, as trustee of the Keys Trust.  *See* Keys Aff. ¶ 5; Keys Aff. Ex. E.  The Title Policy was, therefore, still in place as to Keys individually when she mailed Chicago Title a notice of claim on or about

---

[6] The title insurance treatise on which Keys relies in her Response to Chicago Title's Motion is also persuasive on the issue of interpreting title insurance policies' continuation of insurance clauses.  *See* Joyce Palomar, 1 Title Ins. Law § 4.6 (2011) (asserting that to preserve an existing claim, title insurance policies "do[] not require the insured to hold the land while waiting–sometimes for several years–for the title insurer to pay," and noting that a converse interpretation of the policies' "continuation of coverage" condition would be contrary to insureds' expectations and contrary to public policy that favors the alienability of land).

October 27, 2008, informing Chicago Title that while attempting to sell her home, she

discovered that there was a tax lien on the property that predated Keys' purchase of the property.

*See* Keys Aff. ¶ 4.  Based on these facts and the language of the Title Policy, Keys has standing

as an individual to continue her action against Chicago Title.

**B. The Keys Trust may pursue a legal action against Chicago Title.**

As established above, Keys, as an individual, has standing to sue Chicago Title.

Additionally, Chicago Title concedes that the Keys Trust is an insured under the Title Policy.[7]

Chicago Title argues, though, that because the Keys Trust has never provided notice of its

ownership of the subject property or provided any notice of claim under the Title Policy, the

Keys Trust cannot now assert claims against Chicago Title in this action.  *See* Def.'s Mot.

Summ. J. 3; Def.'s Reply to Pl.'s Resp. 9.  Chicago Title's assertion is inconsistent with the

language of the Title Policy.

The Title Policy provides the following regarding an insured's obligation to submit a

notice of claim under the policy:

> NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT
> The Insured shall notify the Company promptly in writing . . . (ii) in case
> Knowledge shall come to an Insured hereunder of any claim of title or interest
> that is adverse to the Title, as insured, and that might cause loss or damage for
> which the Company may be liable by virtue of this policy, or (iii) if the Title, as
> insured, is rejected as Unmarketable Title.  If the Company is prejudiced by the
> failure of the Insured Claimant to provide prompt notice, the Company's liability
> to the Insured Claimant under the policy shall be reduced to the extent of the
> prejudice.

Def.'s Mot. Summ. J. Ex. B, at 4.  According to the Title Policy, included in the definition of

---

[7] The Title Policy provides that the term "Insured" also includes "a grantee of an Insured under a deed delivered without payment of actual valuable consideration conveying the Title . . . if the grantee is a trustee or beneficiary of a trust created by a written instrument established by the Insured named in Schedule A for estate planning purposes."  Def.'s Mot. Summ. J. Ex. B, at 4.

13

"Insured" is the "Insured named in Schedule A" and "a grantee of an Insured under a deed delivered without payment of actual valuable consideration conveying the Title . . . if the grantee is a trustee or beneficiary of a trust created by a written instrument established by the Insured named in Schedule A for estate planning purposes." *Id.*

An insured can reasonably interpret the above language to mean that once a claim has been made under the policy by a named insured, the claim satisfies the notice of claim requirement for a trustee that succeeds as owner of the subject property. This is especially true when the trustee is the same person as "the Insured named in Schedule A" of the Title Policy. To the extent there is ambiguity surrounding the meaning of the Title Policy's notice requirements, under Mississippi law, these ambiguities are interpreted in favor of the insured. *See Willow Ridge*, 706 F. Supp. at 482.

The facts of this case, therefore, support the conclusion that the Keys Trust, through Keys as trustee, can sustain a legal action against Chicago Title. On or about October 27, 2008, Keys sent a letter to Chicago Title notifying Chicago Title of the basis for her claim under the policy. Keys Aff. Ex. D. Approximately nine months later, on August 5, 2009, Keys deeded the property to herself, as trustee of the Keys Trust, without valuable consideration and for the purpose of estate planning. Keys Aff. ¶ 5; Keys Aff. Ex. E. By that date, Chicago Title still had not resolved Keys' October 27, 2008, claim. Based on reasonable interpretation of the Title Policy's language, there was no need for Keys, as trustee of the Keys Trust, to send another notice of claim to Chicago Title. To the extent Chicago Title is suggesting that after Keys conveyed the property, she should have sent a second, nearly identical letter of claim specifically identifying herself as trustee of the Keys Trust in order to obtain a basis for bringing a lawsuit,

14

that argument is unpersuasive; Chicago Title was already on notice regarding the circumstances surrounding the claim and would be communicating with the same person regarding the claim–Keys–regardless of whether Keys, the individual, or Keys, the trustee, now held title to the subject property.[8]  Further, Chicago Title has not pointed to any provision in the Title Policy requiring that a claimant identify the trust that succeeds as owner of the Title Policy in a notice of claim.

Chicago Title's argument that the Keys Trust cannot sustain an action against Chicago Title because the Keys Trust never made a claim under the Title Policy fails.

### IV. CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment is denied.

**SO ORDERED**, this the 28th day of September, 2012.

s/Carlton W. Reeves
UNITED STATES DISTRICT JUDGE

---

[8] Obviously, Chicago Title cannot argue that it has been prejudiced.

15